**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**AT LEXINGTON**

**CIVIL ACTION NO. 11-28-DLB-REW**

**TIFFANY ANESTIS, ET AL.** **PLAINTIFFS**


**VS.** **MEMORANDUM OPINION AND ORDER**


**UNITED STATES OF AMERICA** **DEFENDANT**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## I. INTRODUCTION

This matter is before the Court on three separate motions–Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. # 151), Defendant's Motion for Summary Judgment (Doc. # 152), and Plaintiffs' Motion for Partial Summary Judgment (Doc. # 153). For the reasons set forth below, the Court will deny both of Defendant's motions and grant Plaintiffs' motion.

## II. FACTUAL AND PROCEDURAL BACKGROUND

This is a medical malpractice suit brought under the Federal Tort Claims Act. Cameron Anestis, now deceased, served in the United States Marine Corps and was deployed to Iraq for about nine months. (Doc. # 88-1, at 43).[1] Cameron's unit was demobilized, and he returned to his hometown of Lexington, Kentucky in April, 2009. (*Id.*) Shortly after his return, both his parents and wife noticed signs of mental illness. (*Id.* at 57-

---

[1] Following the appeal, the parties were permitted to refer to exhibits that were attached to their previous dispositive motions in lieu of submitting attachments anew.

58; Doc. # 88-2, at 55). After emotionally describing a traumatic incident to his parents–involving the apparent death of two children–Cameron Anestis agreed to his parents requests that he seek medical treatment at the local Department of Veterans Affairs hospital. (Doc. # 88-2, at 59-60).

Cameron's efforts to seek treatment met with little success. He first sought help at the Leestown Road VA clinic, one of four divisions of the Lexington VA medical center, on August 17, 2009. (Doc. # 151-1, at 5). He was turned away by the intake clerk at the Leestown clinic, apparently because he had not enrolled in the VA system. (Doc. # 90-8, at 7-8). Under VA operating procedures, veterans who presented to the Leestown clinic in need of care were referred to another division of the Lexington VA system–the Cooper division–where the veteran could be properly enrolled. (*Id.*) On the other hand, a veteran suffering from an obvious medical emergency would receive some baseline level of care: either a "code team" would administer care to the veteran or the intake clerk would call emergency responders. (*Id.* at 50).

The intake clerk on duty at the time was Carol McIntosh, and McIntosh immediately worried about Cameron's mental state. Though he didn't mention suicide explicitly, McIntosh has reported that she felt Cameron was suicidal. (Doc. # 151-1, at 9; Doc. # 153, at 3). After chatting privately with Cameron and listening to him recount his traumatic experiences in Iraq, McIntosh explained that Cameron could not receive treatment at the Leestown VA clinic because the clinic did not accept walk-ins. (Doc. # 88-3, at 26-27). McIntosh advised that Cameron report to the Cooper division, where he could be "put...in the computer" and access emergency care. (*Id.* at 39).

2

The parties dispute where Cameron traveled next. Cameron left the Leestown clinic, apparently intending to seek treatment at the Cooper division. According to his father, Cameron was turned away from the Cooper division because he did not possess his DD214–essentially, his military discharge papers. (Doc. # 88-2, at 109). Plaintiffs also contend that multiple witnesses saw Cameron at the Cooper division on August 17. (Doc. # 153, at 5). However, the government argues that Cameron's father misinterpreted the August 17 phone call and that no witness testimony clearly establishes that Cameron Anestis sought treatment at the Cooper division. (Doc. # 151-1, at 9-10).

What happened next is uncontroversially tragic. Cameron returned home, hoping to find his DD214. (Doc. # 88-1, at 117-125). Though his wife Tiffany helped, the two were unable to locate the form, and Cameron became enraged. (*Id.*) After an intense fight–during which Cameron physically assaulted his wife and threatened to kill her–Tiffany escaped to her baby's room and locked the door. (*Id.*) It was there that she heard a single gunshot–the same gunshot that killed her husband. (*Id.*) Cameron had committed suicide.

Believing that the VA had failed her husband, Tiffany pursued various administrative remedies before filing suit under the FTCA. *Anestis v. United States*, 749 F.3d 520, 524 (6th Cir. 2014), *reh'g denied* (June 30, 2014). The government moved to dismiss the claim, on the grounds that the Veterans Judicial Review Act (VJRA) deprived this Court of jurisdiction to hear the claim. (*Id.*) This Court agreed, granting the motion and dismissing the case. (*Id.*) However, on appeal the Sixth Circuit held that the VJRA applied only to benefits determinations, and as the decisions of the Leestown and Cooper VA clinics did not constitute a benefits determination, the VJRA did not deprive federal courts of jurisdiction over Anestis's claim. (*Id.*) On remand, the parties have again raised issues that

3

were not previously addressed prior to the appeal and subsequent remand. The government once again argues that the VA owed no duty to Cameron and that even if it had, its conduct did not cause Cameron's death; Plaintiffs ask the Court to rule, as a matter of law, that the VA both owed a duty to Cameron Anestis and breached that duty.

## III.   LEGAL STANDARD

### A.   The Court will treat Defendant's Motion to Dismiss as a Motion for Summary Judgment.

Defendant is accurate that unless Plaintiffs possess a valid state law claim, the United States does not waive its sovereign immunity and thus cannot be sued. *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). However, the Federal Tort Claims Act (FTCA) provides that the government will waive its immunity so long as "a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346. The "law of the place" is, for present purposes, the law of Kentucky. So the relevant inquiry here is whether Kentucky provides a cause of action that allows Plaintiffs to sue the United States. If not, the FTCA does not apply, and the Court has no jurisdiction to entertain the dispute. *Meyer*, 510 U.S. at 475 ("Sovereign immunity is jurisdictional in nature.").

As multiple courts have recognized, the jurisdictional question in this context closely ties into the merits. If Plaintiffs have a valid cause of action, the FTCA waives the government's immunity. If Plaintiffs do not have a valid substantive cause of action, the FTCA bars the suit on jurisdictional grounds. A number of federal circuit courts have held that, because of this relationship between the merits of the claim and the Court's jurisdiction over it, Rule 12(b)(1) motions should be converted to Rule 56 motions. *See,*

4

*e.g.*, *Bell v. United States*, 127 F.3d 1226, 1228 (10th Cir. 1997); *Montez v. Dep't of Navy*, 392 F.3d 147, 150 (5th Cir. 2004). While the Sixth Circuit has not, to the Court's knowledge, explicitly held that Rule 12(b)(1) motions should always be converted in the FTCA context, it has held that "if...an attack on subject-matter jurisdiction also implicates an element of the cause of action, then the district court should 'find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's claim.'" Id. *Gentek Bldg. Products, Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) (citing *Williamson*, 645 F.2d 404, 415-16 (5th Cir. 1981). Because of the overwhelming weight of authority, both from within this circuit and elsewhere, this Court will "find that jurisdiction exists" and "deal with the objection as a direct attack on the merits of plaintiff's claim."

## B.    Summary Judgment Standard

Accordingly, the Court will treat all pending motions as motions for summary judgment under Federal Rule of Civil Procedure 56. Under Rule 56, the non-moving party need only show that "there is a genuine issue of material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). If there is no issue of material fact, and it is clear that the non-moving party cannot show an essential element of his claim, then the Court will grant the motion and dismiss the non-movant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

With that standard in mind, the Court turns to the parties' respective motions.

## IV. ANALYSIS

### A. The VA owed a duty to Cameron Anestis, and it breached that duty.

#### 1. The VA owed a duty to Cameron Anestis because he suffered from a medical emergency.

Defendant, in its motion to dismiss, asks the Court to hold as a matter of law that the VA owed no duty to Cameron Anestis. Plaintiffs, in their motion for partial summary judgment, ask the Court to do the opposite. The question, as all parties recognize, is whether Kentucky state law imposes a duty on the VA–otherwise, the FTCA waiver of sovereign immunity will not apply. On this question, Plaintiffs have the better answer.

In their motion for partial summary judgment, Plaintiffs advance essentially two theories for why the VA did, in fact, owe Cameron Anestis a duty of care. The first of these ("the internal policy theory") postulates that the VA's own internal regulations required that the Leestown intake clerk take minimal steps to ensure that Cameron received some medical care. (Doc. # 153, at 14) ("Likewise, the VA owed a legal duty to Cameron to follow its established policies.").

Though an interesting theory, it suffers a fatal flaw: there are material factual questions regarding whether the VA policies required anything more of McIntosh–the Leestown VA clerk. On the question of what VA policy actually requires of an intake clerk, Plaintiff cites the deposition of Dr. Getulio Tovar, (*See* Doc. # 153, at 6-7, 15), McIntosh's deposition, (*see id.* at 8-12), and others. None of these sources conclusively establish that the VA had a policy requiring the Leestown intake clerk to do more than she did. In fact, there is some evidence that McIntosh did what VA policy required of her–turn Cameron Anestis away and direct him to the Cooper clinic. (*See, e.g.*, *id.* at 9) (referencing

6

Leestown's "no-walk-in policy.") Furthermore, as Defendant indicates, Dr. Tovar's testimony has little to do with what was required of McIntosh; his testimony instead focused on what would be required of a mental health clerk. (Doc. # 156, at 22). In other words, the record offers only conflicting evidence about what, precisely, VA policy required of the Leestown intake clerk. Because the Court cannot judge the implications of a policy that is very much in dispute, it will not adopt Plaintiff's theory here.

However, Plaintiffs also assert that the VA owed a more general duty of care–one arising out of Cameron's health emergency. Kentucky law does indeed recognize that both hospitals and physicians owe a duty of care to patients with an emergency condition. *Richard v. Adair Hosp. Found. Corp.*, 566 S.W.2d 791, 793 (Ky. Ct. App. 1978) ("where a hospital refuses care in an emergency situation, liability may be predicated upon such refusal."); *see also Noble v. Sartori*, 799 S.W.2d 8, 10 (Ky. 1990) (applying *Adair* and holding that in at least some circumstances, a doctor has a duty to treat an individual experiencing a medical emergency).

The legal principles in play are neither complex nor disputed. Medical facilities owe a duty of care to those who those who present with a medical emergency. The only questions that remain are twofold: first, whether Cameron Anestis suffered from a mental health emergency when he arrived at the Leestown clinic[2]; and second, whether the Leestown clinic is the type of facility that owes a duty of care to those with emergency conditions.

---

[2] Plaintiffs argue in their brief that whether Cameron suffered from a medical emergency need not be resolved. But *Adair* requires an emergency condition before a hospital's duty to treat arises. In light of the Court's finding that material factual issues remain regarding the VA's rules and regulations, a determination that Cameron faced a medical emergency is necessary.

The first of these questions is relatively simple: Carol McIntosh, the VA's intake clerk, could not have been more clear that Cameron Anestis faced a medical emergency. McIntosh took Cameron to a private area, where they spoke about Cameron's personal problems and mental health worries. (Doc. # 88-3, at 22). Cameron repeatedly express his view that he "needed help." (*Id.*) For her part, McIntosh felt that she had to "talk him down" and "[baby] him." (*Id.* at 24). As the Sixth Circuit noted, McIntosh also felt that Cameron was suicidal, as he spoke about being "at the end of the rope."[3] *Anestis*, 749 F.3d 523. Though McIntosh later offered conflicting statements regarding Cameron's suicidal potential, (Doc. # 151-1, at 9), the Court need not conclude that Cameron was suicidal to conclude that he did, in fact, suffer from a medical emergency. Defendant offers nothing to raise an issue of material fact. Indeed, when the only live question is whether McIntosh felt that Cameron was actually suicidal or just very emotionally troubled, the Court cannot avoid concluding that Cameron faced a mental health emergency. *See* 42 U.S.C.§ 1395dd(e)(1)(A)(I) (defining a "medical emergency" as a medical condition that *could* place an individual's health in "serious jeopardy.").

The second question is more difficult, and much that Defendant has filed contends that the Leestown clinic is not the sort of medical facility that must provide emergency medical treatment. This argument rests on the Leestown clinic's limited resources: it had

---

[3] Defendant argues that McIntosh's statements about Cameron Anestis, made during an interview with VA legal counsel, should not be considered as inadmissible hearsay. The Court disagrees for two reasons. First, the Sixth Circuit relied on that interview during its factual summary. *See Anestis*, 749 F.3d at 523). Second, Federal Rule of Evidence Rule 801(d) provides a statement, offered against an opposing party, is not hearsay if it "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). This statement, made by an employee of the VA, clearly qualifies as an admission of a party-opponent.

no inpatient care to speak of, lacked an emergency room, and had no ambulance.  (Doc.
# 151-1, at 6; *id.* at 27, n. 13).  Further, Defendant apparently sees great relevance in the
fact that no health care professional ever saw Cameron Anestis at Leestown–only Carol
McIntosh, an intake clerk, spoke with him at length.

Neither party has provided much authority to delineate which type of medical
facilities have a duty to treat emergency patients and which do not.  *Adair*, the *American
Law Reports* on which the case relies, and other authorities provide some guidance on the
contours of the duty to provide emergency care.  *See generally* 35 A.L.R.3d 841 (Originally
published in 1971) (documenting the various state law approaches to the duty to provide
emergency care).  *See also Nunsuch ex rel. Nunsuch v. United States*, 221 F. Supp. 2d
1027, 1033 (D. Ariz. 2001) (holding a hospital can avoid the duty to provide medical care
by showing "that the hospital is not obligated (or capable) under its state license to provide
the necessary emergency medical care."). The lesson of these cases is that a hospital's
<u>duty</u> to treat during emergencies comes from its <u>capacity</u> to treat: if a hospital is able to
provide emergency health services, it must do so; if it lacks that ability, it consequently has
no duty to provide care. *See also* Karen H. Rothenberg, *Who Cares?: The Evolution of the
Legal Duty to Provide Emergency Care*, 26 HOUS. L. REV. 21, 34 (1989) (discussing the
evolution of the duty to provide emergency care).

In light of this principle, this case presents an especially difficult issue.  On the one
hand, the Leestown clinic was obviously a limited medical facility with limited resources.
It had no emergency capability to speak of.  Yet the Court worries that to view the
Leestown clinic in isolation is to narrow the VA's duty of care to an absurd level.  The
Leestown clinic, after all, is but one division within a much larger Lexington VA Medical

Center. (Doc. # 151-1, at 5). Notably, the Leestown clinic is located a mere five miles away from the Cooper clinic, which does provide emergency services. (*Id.*)

The government contends that the VA had no duty to treat Cameron Anestis, because he never presented for treatment at a VA clinic with emergency facilities. But how far is the government willing to take this argument? What if the Cooper clinic was located only a mile away from the Leestown clinic? What if the Cooper clinic was across the street, or just in a different ward?

While the duty to provide emergency care has always been limited to those hospitals that actually have emergency facilities, this case presents a unique factual circumstance: the hospital in question here isn't a single building but is, by the government's own admission, a network of medical facilities all falling under the "Lexington VA Medical Center" umbrella. (Doc. # 151-1, at 6). These facilities share a common geography, a common bureaucratic element of control–as evidenced by the Cooper division's responsibility for enrollment for the entire Lexington center–and even a common name. As the Leestown intake clerk Carol McIntosh noted, practically "everybody knows" that the Leestown clinic was the place to go for walk-in mental health treatment. (Doc. # 88-3, at 23). This belief was so widespread among the community's veterans that McIntosh warned her superiors on multiple occasions that Leestown's no walk-in policy might eventually cause serious problems. (*Id.* at 27-28). It goes without saying that she was a prophet.

The Department of Veterans Affairs is one of the largest health care providers in the world, and it is free to organize itself however it sees fit. However, when it chooses to operate a network of medical facilities in the same city, provide emergency services at one of those facilities, and organize those facilities together, it must follow Kentucky law: it must

treat those who suffer from an emergency condition.

It is undoubtedly true that other large health care providers also operate networks of hospitals across cities and even states. The Court makes no judgment about where to draw the line in more difficult cases--where control over different facilities is more dispersed, either geographically, administratively, or bureaucratically. Yet wherever the Court might draw that line, this case doesn't even come close. The VA cannot escape the duty to treat because Cameron Anestis showed up at the wrong place–a place that numerous other veterans similarly thought was the appropriate location for walk-in mental health treatment.

The government finds *Adair* "inapposite" because *Adair* involved a patient who was "seen" by a nurse before the nurse refused admittance to the emergency room. (Doc. # 151-1, at 31). The government apparently believes that before a hospital's duty to provide emergency care arises, a medical professional must first see a patient. That is not the legal rule adopted by the court in *Adair*. Nor is it the legal rule adopted by any other court that recognizes a duty to provide emergency care. *See Adair*, 566 S.W.2d at 793 (citing *Wilmington General Hospital v. Manlove*, 54 Del. 15, 174 A.2d 135 (1961)). Furthermore, it is a rule that would lead to absurd results. One can imagine emergency rooms barricaded from the general public with administrative gatekeepers pronouncing who can and cannot receive treatment. And because patients interact only with non-medical intake clerks, hospitals cleverly avoid all duties to treat imposed by state and federal law. This is where Defendant's theory leads, and the Court will not follow.

Yes, *Adair* applies, and because it does so, the Court finds that the VA did, in fact, owe a duty to treat Cameron Anestis.

11

**2.     The VA breached the duty it owed.**

Having concluded that the VA owed a duty to Cameron Anestis, it almost goes without saying that it breached that duty. That duty required, given *Adair* and related cases, that the Leestown folks treat Cameron to the capacity they were able. The Leestown clerk could have called an ambulance. The VA could have adopted a policy that allowed walk-in appointments during medical emergencies. The doctors and medical staff on duty at the time Cameron arrived at the Leestown facility could have violated that policy in the face of a medical emergency. Whatever the VA and its employees *could have* done, however, it is clear that they did nothing except for give him directions to the Cooper clinic. (Doc. # 88-4, at 3). This is not nearly enough, and it constituted a breach of the VA's duty to treat Cameron Anestis.

**3.     The Court will not now decide whether the VA owed additional duties to Cameron Anestis.**

In a separate motion, the government asks the Court to exclude Plaintiffs' standard of care witness, Leslie Burger, and asserts that if the Court does so, Defendants' motion must be granted. (Doc. # 152-1, at 23). Entirely aside from the duty to provide emergency care, it appears that Dr. Burger may testify about duties that arise from VA policy or from a more general standard of care. (*Id.*) The Court need not address this request because the government has not refiled the motion in limine with regards to Burger, so this ground for relief is essentially moot. If Plaintiffs wish to rely on Burger's testimony to establish that the VA owed an additional duty, they may do so, and then Defendants are free to refile the motion in limine and a motion for summary judgment on this narrow issue.

12

Even if Burger is allowed to testify, however, the government claims that the VA cannot possibly have breached its duty to Mr. Anestis. Confronting Burger's testimony, the government essentially argues that the requirements of VA policy remain a live factual question. (Doc. # 152-1). And though Burger opines that the VA failed to follow a universal standard of care, Defendant sees this opinion as little more than a normative judgment. (*Id.*) The Court rejects this argument, for now. First, as noted already, what VA policy required in this case is very much undetermined. Second, Defendant's arguments, while ostensibly about a breach, essentially just repackage the contention that there is no duty to begin with. (*See* Doc. #152-1, at 25) ("the clear mandate of the FTCA requires this Court to look to the *law of Kentucky* to determine whether the VAMC met the applicable standard of care in this case.") Third, Defendant's suggestion that Plaintiffs "have not met their burden of establishing that the VAMC breached the standard of care" is both conclusory and irrelevant: the Plaintiffs need not meet an especially high burden at this stage of the litigation–that onus is on Defendant.

4.     **Material factual issues remain regarding whether the Cooper clinic's conduct gave rise to a duty to treat.**

At this point, the question of whether Cameron Anestis ever set foot in the VA's Cooper clinic is little more than he said-she said. (Doc. # 151-1, at 9) (claiming that no witnesses saw Cameron at the Cooper clinic); (Doc. # 154, at 6) (noting that Cameron's father believed he was at the VA clinic). The suggestion that there is "no evidence" that Cameron ever went to the Cooper clinic is false. Cameron's father's belief that Cameron was at the Cooper clinic, even if not clearly supported by Cameron's explicit statements, is at least some evidence. And the Supreme Court requires that the "evidence of the non-

13

movant"–here Plaintiffs–"be believed." Anderson 477 U.S., at 255. If the Court accepts Plaintiffs' evidence, as it must, it cannot possibly conclude that Cameron never went to the Cooper clinic.

Indeed, other evidence suggests that he might have. One Cooper clinic employee indicates that she thought Cameron "looked similar to a guy we had passed in the hallway" of her workplace. (Doc. # 131-10, at 12-13). So persuaded was she that she saw him that she decided to search for his pictures on facebook after she learned of his death. (*Id.)* Her coworkers shared these sentiments. (*Id.* at 16).

The Court is unsure whether Cameron traveled to the Cooper clinic or what he did there. But Defendant's claim that Cameron never set foot in the Cooper clinic–and thus that nothing that occurred at the Cooper clinic gave rise to a VA duty to treat–cannot be accepted at this summary judgment stage. Material factual issues remain, and summary judgment is thus inappropriate.

**B.** **Whether the government's conduct caused Cameron's injuries require further fact finding.**

**1.** **The government's assertion that Cameron's suicide is an intervening cause is meritless.**

The government, citing a Sixth Circuit case that has nothing do with medical malpractice, argues that there is a "general rule" that suicide is an "independent intervening act." (Doc. # 152-1, at 12). This sort of independent act breaks the causal chain between negligent conduct and the harm caused. (*Id.*)

No one disputes that absent a causal connection between negligent conduct and an injury, the government will have no liability. "By itself, moreover, a breach of duty is not

enough to warrant recovery; there can be no liability for negligence if the negligence is not shown to have 'caused' the injury complained of. And Kentucky courts have long recognized that the chain of causation may be broken by 'facts [that] are legally sufficient to constitute an intervening cause.'" *Watters v. TSR, Inc.*, 904 F.2d 378, 383 (6th Cir. 1990) (citing *Montgomery Elevator Co. v. McCullough*, 676 S.W.2d 776, 780 (Ky.1984)).

Yet as the Defendants note, the Sixth Circuit's "general rule" that suicide is an intervening cause was discussed in a case where the person who committed suicide did so after playing a game. *Watters*, 904 F.2d at 382. Neither the Sixth Circuit in *Watters* nor the Eastern District of Kentucky in *Epelbaum v. Elf Atochem, N. Am., Inc.*, 40 F. Supp. 2d 429, 431 (E.D. Ky. 1999) held that suicide was always an intervening cause unless certain exceptions applied. They instead noted a generally applicable rule that applied in standard negligence–not medical malpractice–cases.

The Court is aware of no authority that would treat suicide as an intervening cause in medical malpractice suits where the very issue in the case is mental health care. In fact, a Kentucky case more recent than either of the federal cases cited by the Defendants directly contradicts this proposition. In *Bowden v. Sandler*, 2008-CA-001279-MR, 2009 WL 1491395 (Ky. Ct. App. May 29, 2009), the Court of Appeals of Kentucky held that if a provider's "deviation from the standard of care" is a "substantial factor in causing" suicide, then the causation element is satisfied. *Id.* "Having reviewed the record, including the testimony of both experts testifying on Bowden's behalf, we are of the belief that this burden was met, at least to the extent that a question of material fact would exist for jury determination." *Id.* Notably, the court did not discuss the "general rule" Defendants suggest or any exceptions to the same. It did not do so because there is no presumption

15

in Kentucky law that suicide is an intervening cause shielding hospitals and physicians from liability.

The Court is hardly prepared to rule, as a matter of law, that the VA's breach of its duty caused Cameron's injury and death. But it is equally unprepared to rule the opposite. More facts must come to light.

> **2.    The Court will not rule that the fight between Tiffany and Cameron Anestis constituted an intervening cause.**

Defendants also assert that the argument between Tiffany and Cameron Anestis constituted an intervening cause. By Defendants reading, "[i]t was not until Mr. and Ms. [sic] argues that events escalated." (Doc. # 152-1, at 16).

Although Defendants muster a compelling case on this issue, it is not so compelling that the Court will dismiss Plaintiffs' claim at this stage of the litigation. While the fight between Cameron and Tiffany appears to have been severe–he choked her and she told him she wanted a divorce, among other things–it remains debatable whether the fight caused Cameron's suicide.

While Defendants recount in harrowing detail the severity of the fight, neither the government nor this Court are experts in mental health. Before determining whether a fight constituted an intervening cause, the Court would like to weigh the testimony of mental health experts, hear from all parties an account of the fight, and understand in greater detail what else happened to Cameron–before, during, and after the fight.

At least one expert indicated that the fight was merely the "straw that broke the camel's back." (Doc. # 108-5, at 29; Doc. # 155-6, at 10). The real culprit, said Dr. Joseph Mann, was "all that other baggage that he's carrying that nobody evaluated and treated."

(*Id.*) The fight might have been yet another consequence of the government negligence: after all, if Cameron had successfully found treatment at the VA that day, perhaps he would never have fought with his wife at all. Or perhaps the fight was itself the primary cause of Cameron's suicide. The Court simply doesn't know. And because, at this stage, "[t]he evidence of the non-movant"–on this issue, Plaintiffs–"is to be believed, and all justifiable inferences are to be drawn in his favor," the Court cannot rule for Defendant. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). Having drawn all justifiable inferences in Plaintiffs' favor, the Court will not conclude that Tiffany and Cameron's argument was an intervening cause.

### 3. Though Plaintiffs have not yet proved that VA conduct was the proximate cause of Cameron Anestis's death, they could.

As Defendant correctly notes, Kentucky law requires that a plaintiff prove that some defendant's negligent conduct proximately caused an injury. (Doc. # 152-1, at 19) (citing *Walden v. Jones*, 439 S.W.2d 571, 574 (Ky. Ct. Appl. 1968)). This legal rule is as rock-solid as it is uncontroversial. And while Plaintiffs have yet to prove this essential element, at this stage, they don't have to: they need only show that material factual issues remain unresolved.

That burden is met here. As it so often does, Defendant documents a number of factual issues that suggest its legal theory should prevail. The government argues, for instance, that Plaintiff's expert witness–Dr. Mann–fails to state with certainty whether a diagnosis might have prevented Cameron's death or whether Cameron was suicidal on the

17

morning he died.  (Doc. # 152-1, at 21)[4].  These facts are quite relevant, and would no

doubt weigh on the mind of a judge or jury tasked with determining whether the Plaintiff met

his burden of proof.

Yet that is not the task before the Court at this summary judgment stage.  Now, the

Court must draw inferences in Plaintiffs' favor and decide whether every material factual

issue has been resolved.  Given Dr. Mann's testimony that Cameron committed suicide

"due to an untreated psychiatric illness," Defendant cannot show an absence of material

factual issues.  (Doc. # 108-5, at 26; Doc. # 155-6, at 7).  The court must draw all

"justifiable inferences" in the Plaintiff's favor, *Anderson*, 477 U.S. at 255, and when it does

so, this is the natural conclusion: that Dr. Mann's testimony, based on "population statistics"

and probabilities, supports the proposition that the VA's conduct was a "substantial factor

in causing" Cameron's suicide.  *See Bowden* 2009 WL 1491395.

Defendant cites *McDowell v. Our Lady of Bellefonte Hosp.*, No. 2001-CA-001360-

MR, 2003 WL 1245128 (Ky. Ct. App. Feb. 14, 2003), to support its motion.  That case

involved an expert witness whose testimony fell "short of establishing the essential causal

connection."  But there are problems with relying on this case.  For starters, the Kentucky

court did not apply the standard of Federal Rule of Civil Procedure 56, as this Court must.

So its utility as a guiding principle is limited.  More importantly, the expert in *McDowell*

refused to opine on even the *probability* that the hospital's conduct might have produced

a different outcome.  While it is true that Dr. Mann admitted that he didn't "know" what

would have happened to Cameron, he is not required to know anything, and indeed it would

---

[4] Unfortunately, Defendant does not cite to the specific parts of the record, despite its
generally well-cited brief.

be impossible to know what might have happened. The law does not require that medical experts act as prophets.

Dr. Mann referred to Cameron as "an individual in crisis" who "required evaluation and help." (Doc. # 108-5, at 19). And, as noted above, Mann further stated that Cameron's suicide was caused by an untreated illness. This evaluation was based on a number of factors. Among them: virtually all suicide derives from untreated mental illness, (*id.* at 20); individuals who receive treatment have a much lower risk of suicide, (*id.* at 21); Cameron's childhood medical records reflected signs of mental illness, (*id.* at 22); Cameron's signs of psychological distress warranted the sort of treatment decisions and evaluations that might have saved his life, (*id.* at 25-26). Defendant is free to dispute this testimony, but it is of a different kind than the testimony presented to the *McDowell* court. And it is certainly enough to survive summary judgment.

**C.      Defendant's remaining arguments either need not or cannot be addressed now.**

Oddly, Defendant references Kentucky's comparative fault statute and case law indicating that, in a wrongful death suit, the beneficiary's award is further reduced in proportion to her fault. (Doc. # 152-1, at 17-19). The obvious implication is that if the Court holds the VA liable for Cameron Anestis's death, then it must reduce Plaintiffs' award to account for both Cameron and Tiffany Anestis's role in Cameron's death. While the Court appreciates Defendant raising this issue, this issue is not yet ripe for determining.

Defendant also argues that the recoverable damages are limited by the amount claimed in Plaintiff's administrative complaint. Defendant further claims that the government is not liable for any pre-judgment interest. (Doc. # 151-1, at 32).

19

The Court is unsure what sort of relief the Defendant requests. Both the allocation of fault and the damages owed are premature at this point. If causation is established at trial, the Court will then have to decide the appropriate amount of damages, and whether apportionment of fault is necessary.

If the Court declares some fact about Kentucky's comparative fault regime, it will not affect the rights of the parties, as there is no fault to divvy up between the parties. If the Court declares that Plaintiffs' damage award is limited, it will not affect the rights of the parties, as no damage award is yet due. What Defendant asks for then, if anything, is for the Court to pass judgment on a hypothetical facts that do not yet "affect the rights of litigants." The Court need not do this as a practical matter, and in light of *Rice*, it likely is not allowed to do that as a matter of law.

## V. CONCLUSION

Accordingly, for the reasons stated above, **IT IS ORDERED** that:

(1)     Plaintiffs' Motion for Partial Summary Judgment (Doc. # 153) is **granted**.

(2)     Defendant's Motion to Dismiss for Lack of Jurisdiction (Doc. # 151) is **denied**.

(3)     Defendant's Motion for Summary Judgment (Doc. # 152) is **denied** in part with respect to the issues of intervening cause and proximate cause and **held in abeyance** with respect to the allocation of fault and the award of damages.

This 30th day of September, 2014.



Signed By:

David L. Bunning

United States District Judge

G:\DATA\Opinions\Lexington\11-28 MOO.wpd