UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

**CIVIL ACTION NO. 11-28-DLB-REW**

**TIFFANY ANESTIS, Individually, and as
Administratrix of the ESTATE OF
CAMERON ANESTIS, deceased, and as
Mother and Next Friend of I.A., an infant**                       **PLAINTIFFS**

vs.                       **MEMORANDUM ORDER**

**UNITED STATES OF AMERICA**                                     **DEFENDANT**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On September 30, 2014, this Court entered its Memorandum Opinion and Order (Doc. # 164) granting Plaintiffs' Partial Motion for Summary Judgment (Doc. # 153) and denying both Defendant's Motion to Dismiss for Lack of Subject-Matter Jurisdiction (Doc. # 151) and Defendant's Motion for Summary Judgment (Doc. # 152). Pursuant to Federal Rule of Civil Procedure 54(b), Defendant now moves this Court to reconsider that part of its Order "granting partial summary judgment for Plaintiffs on the questions of duty and breach" (Doc. # 173). Plaintiff having filed her response (Doc. # 191), and Defendant having failed to file a reply within the allotted time period, this matter is ripe for the Court's review. For reasons set forth herein, Defendant's Motion is hereby **denied**.

**I. STANDARD OF REVIEW**

Pursuant to Federal Rule of Civil Procedure 54(b), "any order or decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer

1

than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and the parties' rights and liabilities." The Sixth Circuit has recognized that this rule allows district courts "to reconsider interlocutory orders and reopen any part of a case before final judgment." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004)(citing *Mallory v. Eyrich*, 922 F.2d 1273, 1281 (6th Cir. 1991)). However, district courts typically reconsider interlocutory orders in the following circumstances only: (1) there is an intervening change of controlling law; (2) new evidence has become available; (3) there is a need to correct a clear error or prevent manifest injustice[1]. *Id.*

## II. ANALYSIS

### 1. The VA had a duty to treat Cameron Anestis

Under Kentucky law, hospitals generally do not have a duty to treat or admit patients without a physician's order. *Richard v. Adair Hosp. Found. Corp.*, 566 S.W.2d 791, 793 (Ky. App. 1978). However, courts have "carved from the general no-duty-to-admit rule a view that where a hospital refuses care in an emergency situation, liability may be predicated upon such refusal." *Id.*; *see also Noble v. Sartori*, 799 S.W.2d 8, 10 (Ky. 1990) (holding that, in some circumstances, a doctor has a duty to treat medical emergencies). Case law suggests that this duty only applies to hospitals that have emergency facilities. *See Adair*, 566 S.W.2d at 791; *Nunsuch ex rel. Nunsuch v. United States*, 221 F. Supp. 2d 1027, 1033 (D. Ariz. 2001) (holding that a hospital can avoid the duty to provide medical

---

[1]Although Defendant's Motion for Reconsideration does not so state, it seems that the arguments presented therein are based upon an alleged need to correct a clear error or prevent manifest injustice.

2

care by showing "that the hospital is not obligated (or capable) under its state license to provide the necessary emergency medical care."); 35 A.L.R.3d 841 (surveying state law approaches to the duty to provide emergency care).

Applying the above-cited case law, this Court recently concluded that the VA had a duty to treat Cameron because he presented to the Leestown clinic with a mental health emergency on August 17, 2009. (Doc. # 164 at 7-9). The Court imposed this duty despite the fact that the Leestown clinic did not have emergency facilities, reasoning that "[t]he VA cannot escape the duty to treat because Cameron Anestis showed up at the wrong place." (*Id.* at 11).

Defendant challenges the Court's duty analysis on two grounds. (Doc. # 173). First, Defendant sets forth expert opinions and mental health records to show that Cameron was *not* in an emergency state when he arrived at the Leestown facility. (*Id.* at 4-9). Second, Defendant argues that the Court expanded Kentucky law too far by ruling that a non-emergency facility had a duty to treat individuals with medical emergencies. (*Id.* at 9-11). The Court will consider each of these arguments in turn.

### a. *Cameron presented to the Leestown clinic with a mental health emergency on August 17, 2009*

As this Court noted in its latest Memorandum Opinion and Order, intake clerk Carole McIntosh "could not have been more clear that Cameron Anestis faced a medical emergency" when he arrived at the Leestown facility on August 17, 2009. (Doc. # 164 at 8). Cameron repeatedly told McIntosh that he "needed help," prompting her to take him aside and speak privately with him about his mental health concerns. (Doc. # 88-3 at 22). He was visibly upset and teary-eyed throughout the conversation. (*Id.* at 25-26). McIntosh

3

felt like she had to "talk him down" and "baby him." (*Id.* at 22-24). She even worried that he may be suicidal, as he spoke about being "at the end of the rope." (Doc. # 88-4 at 2).

Although McIntosh later offered conflicting statements about Cameron's potential for suicide, the Court decided that it "need not conclude that Cameron was suicidal to conclude that he did, in fact, suffer from a medical emergency." (Doc. # 164 at 8). "Indeed, when the only live question is whether McIntosh felt that Cameron was actually suicidal or just very emotionally troubled, the Court cannot avoid concluding that Cameron faced a mental health emergency." (*Id.*). Finding the Court's approach to be too forgiving, Defendant now argues that such an emergency is only present if there is an "imminent risk that the person will take action based on those emotions and harm themselves." (Doc. # 173-1 at 8). Thus, the following question takes center stage on Defendant's Motion for Reconsideration: What constitutes a medical emergency for purposes of Kentucky's duty to provide emergency care?

In determining that Cameron's troubled state constituted a mental health emergency, the Court partially relied upon EMTALA's definition of "medical emergency," which includes all medical conditions that *could* place an individual's health in "serious jeopardy."[2] *See* 42 U.S.C. § 1395dd(e)(1)(A)(I). Defendant now suggests that this interpretation of "medical emergency" is irrelevant, as it "is not aware of any law in Kentucky adopting this definition outside of the context of a lawsuit under EMTALA." (Doc. # 173-1 at 8 n. 5). While Defendant is technically correct, the Court is likewise unaware of Kentucky case law

---

[2] The Emergency Medical Treatment and Active Labor Act ("EMTALA") prevents hospitals from "dumping" patients who are uninsured. *See Cherukuri v. Shalala*, 175 F.3d 446, 448 (6th Cir. 1999).

4

adopting *any* definition of a medical emergency, for purposes of the duty to provide emergency care. Thus, the Court properly looked elsewhere for guidance, and because EMTALA imposes a similar duty to provide emergency care upon Medicare-participating hospitals, the Court found EMTALA to be the best available resource.

EMTALA's definition may not be directly on point, but it is more than Defendant can offer in support of their interpretation of a medical emergency. Without citing to any case law, Defendant insists that "very emotionally troubled" is insufficient, thus drawing the focus back to suicidal tendencies. Perhaps Defendant believes that this interpretation is clearer and easier to apply, but in the Court's view it also has the potential to be quite underinclusive. After all, health care providers faced with possible medical emergencies must quickly decide whether or not to treat, often without all relevant information before them. Surely this task is even more difficult in the case of a mental health emergency, as it is impossible to delve into an individual's thoughts. Defendant's approach practically requires individuals to explicitly communicate thoughts of self-harm in order to receive treatment. And as Cameron's story shows, many individuals who ultimately commit suicide do not express thoughts of self-harm to others.

Using suicidal tendencies as the baseline for a mental health emergency is certainly beneficial for Defendant, who has assembled a bevy of experts ready to opine that Cameron was not suicidal when he arrived at the Leestown clinic. Instead, these experts conclude that Cameron's suicide was an impulsive act, committed out of explosive anger and frustration that developed much later in the day. This theory relies heavily upon Cameron's adolescent history of impulsive behavior, depression and attention deficit with

5

hyperactivity disorder.³  (Docs. # 173-3, 173-4 and 173-5).  Only one expert, Dr. Alan Berman, touched on lesser degrees of mental disturbance, briefly stating that Cameron was "*neither in extreme emotional distress* nor at risk to harm himself" when he arrived at the Leestown clinic.  (Doc. # 173-4 at 3).  And yet, Dr. Berman's supporting analysis concentrates solely on the suicide risk factors.  (*Id.*). By focusing on whether and when Cameron became suicidal, both Defendant and its experts ignore the Court's prior determination that a mental health emergency should not be defined solely by an individual's risk of self-harm.  Thus, they fail to address the possibility that a non-suicidal Cameron presented to the Leestown clinic with a mental disturbance that was still severe enough to constitute a medical emergency.

Defendant repeatedly implores this Court not to be swayed by hindsight bias, given Cameron's tragic death, and yet it seeks to reap the benefit of a different kind of hindsight bias through its experts.  Accomplished though they may be in their respective fields, it is one thing for these experts to review Cameron's medical records and analyze his mental state, *as it existed when he arrived at the Leestown clinic on August 17, 2009,* more than two years later.  It is quite another thing to be in Carole McIntosh's shoes, trying to assess Cameron's mental state on the spot, with only rudimentary training and few facts at her disposal.⁴ Unfortunately for Defendant, it is the latter inquiry that matters most for purposes

---

³ In listing these "factors relevant to Cameron's mental state," Defendant notes that "Cameron failed to disclose his past history of mental illness on more than one occasion."  (Doc. # 173-1 at 4 n. 2).  These past failures have no impact on the Court's duty analysis.

⁴ It is true that Carole McIntosh only had basic training related to her position as an intake clerk with the VA, rather than any specialized medical knowledge.  However, this fact does not impact the duty analysis.  The Court has already rejected Defendant's attempt to argue that a hospital's duty to provide emergency care only arises after a medical professional sees a

6

of the duty to provide emergency care. Otherwise, hospitals could conceivably absolve themselves of liability for failure to treat probable emergency medical conditions, as long as they can find an expert to opine that the individual did not present in an emergency state after all.

If the Court is not inclined to find that Cameron did not suffer from a mental health emergency, Defendant asks the Court to at least defer this question until trial, so that the above-referenced expert opinions and mental health records may be fully presented. This evidence may well be relevant to the issue of causation, which the Court did defer until trial, but it simply distracts from the duty analysis. Carole McIntosh did not have access to Cameron's medical records on August 17, 2009, so she was unaware of his history of impulsive behavior and anger management issues. Even if she had been able to obtain that information, it would only have given her more reason to treat Cameron. Therefore, Defendant has presented nothing in its motion to convince this Court that it is necessary to revise this aspect of the duty analysis.

### b. *Imposing a duty to treat medical emergencies upon the Leestown clinic is not an unwarranted expansion of state law*

In its latest Memorandum Opinion and Order, the Court explained that "a hospital's duty to treat during emergencies comes from its capacity to treat: if a hospital is able to provide emergency health services, it must do so; if it lacks that ability, it consequently has no duty to provide care." (Doc. # 164 at 9). Although the Leestown clinic lacked

---

patient, reasoning that such a rule would lead to absurd results. "One can imagine emergency rooms barricaded from the general public with administrative gatekeepers pronouncing who can and cannot receive treatment. And because patients interact only with non-medical intake clerks, hospitals cleverly avoid all duties to treat imposed by state and federal law." (Doc. # 164 at 11).

emergency facilities, such as inpatient care, ambulances or emergency rooms, the Court nevertheless imposed a duty to provide emergency care upon it. In so doing, the Court noted that the Leestown clinic is but one of four divisions within the Lexington VA network, all of which share a common name, geography and bureaucratic element of control. (Doc. # 164 at 9). Thus, "to view the Leestown clinic in isolation is to narrow the VA's duty of care to an absurd level." (*Id.*).

However, the Court explained that this holding was very limited in scope:

> It is undoubtedly true that other large health care providers also operate networks of hospitals across cities and even states. The Court makes no judgment about where to draw the line in more difficult cases–where control over different facilities is more dispersed, either geographically, administratively, or bureaucratically. Yet wherever the Court might draw that line, this case doesn't even come close. The VA cannot escape the duty to treat because Cameron Anestis showed up at the wrong place–a place that numerous other veterans similarly thought was the appropriate location for walk-in mental health treatment.

(*Id.* at 10).

Despite the Court's efforts to narrow its ruling, Defendant insists that there are widespread implications for healthcare providers. Specifically, Defendant posits that, "if a medical facility's 'duty to treat during emergencies comes from its capacity to treat,' and a facility's capacity to treat is interpreted to include the resources available at other, affiliated health facilities . . . a duty would be imposed on numerous medical facilities that are staffed and equipped for specific non-emergency services." (Doc. # 173-1 at 10). Defendant believes that UK, St. Elizabeth and Norton are among the many healthcare networks that would be affected by the Court's ruling because they are composed of various medical facilities that share a common name, geography and element of administrative control. (*Id.*). Thus, all non-emergency facilities within each of these networks would be put in an

8

untenable position–they would be obligated to provide emergency care, simply because the network includes an emergency services facility. (*Id.*).

Defendant's argument presupposes that the aforementioned healthcare providers are akin to the Lexington VA. They are not, despite the fact that they have an organizational structure very similar to that of the Lexington VA. After all, UK, St. Elizabeth and Norton hold themselves open to all members of the community. Treatment is not limited to any particular demographic. By contrast, the Lexington VA is organized for the sole purpose of providing healthcare to veterans, and thus, only veterans are eligible for treatment at the VA. When a healthcare provider serves a particularly small cross-section of the community, as the Lexington VA does,[5] it is reasonable to impose upon it a duty to provide emergency care, whether or not an individual seeks treatment at the correct location. Under these circumstances, the Court held, and reaffirms today, that the Leestown clinic had a duty to treat Cameron Anestis when he presented with a mental health emergency on August 17, 2009.

### 2. The VA breached its duty to Cameron Anestis

This Court previously found that the VA breached its duty to treat Cameron's mental health emergency by turning him away and redirecting him to the Cooper Drive location. (*Id.* at 12). Defendant now attacks the Court's breach analysis by arguing that the VA could not have breached a duty to Cameron because it did not owe him a duty in the first place.

---

[5] While the Court does not have precise figures on the Lexington VA's patient pool, roughly 8% of Kentucky's entire population are veterans. *Compare* National Center for Veterans Analysis and Statistics, http://www.va.gov/vetdata/veteran_population.asp (reporting that there were 330,599 veterans in Kentucky as of September 30, 2014) *with* United States Census Bureau, http://quickfacts.census.gov/qfd/states/21000.html (estimating that Kentucky's total population in 2013 was 4,395,295).

(Doc. # 173-1 at 1).

Defendant's argument necessarily rises and falls with the Court's reconsideration of the duty question. Because the Court has already reaffirmed its finding that the Leestown clinic had a duty to treat Cameron, it will simply stand upon its prior analysis regarding breach of that duty:

> Having concluded that the VA owed a duty to Cameron Anestis, it almost goes without saying that he breached that duty. That duty required, given *Adair* and related cases, that the Leestown folks treat Cameron to the capacity they were able. The Leestown clerk could have called an ambulance. The VA could have adopted a policy that allowed walk-in appointments during medical emergencies. The doctors and medical staff on duty at the time Cameron arrived at the Leestown facility could have violated that policy in the face of a medical emergency. Whatever the VA and its employees *could have* done, however, it is clear that they did nothing except for give him directions to the Cooper clinic. This is not nearly enough, and it constituted a breach of the VA's duty to treat Cameron Anestis.

(Doc. # 164 at 12).

### III. CONCLUSION

Accordingly, for the reasons stated above,

**IT IS ORDERED** that Defendant's Motion for Reconsideration (Doc. # 173) is hereby **denied**.

This 3rd day of December, 2014.



Signed By:
David L. Bunning
United States District Judge

G:\DATA\ORDERS\Lexington\2011\11-28 Order re Mtn for Reconsideration.wpd

10